# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1631

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Gregory Charles Ervasti, | * | |
| | * | |
| Appellant. | * | |

_____

No. 99-1636

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Deniene "Dee" Ervasti, | * |
| | * |
| Appellant. | * |

_____

Submitted: October 19, 1999
Filed: January 13, 2000

_____

Before BOWMAN, LAY, and BEAM, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Gregory and Deniene "Dee" Ervasti appeal their convictions and sentences arising out of the misappropriation of over $5.7 million of impounded tax monies from over 100 clients of their payroll processing corporation. For the reasons stated below, we affirm in part and reverse and remand in part.

I.

We begin with a summary of the facts underlying the Ervastis' convictions. From 1991 to 1995, Gregory and Deniene "Dee" Ervasti, husband and wife, owned and operated Corporate Financial Services, Inc. ("CFS"). CFS offered a variety of payroll processing services to employers, including a tax filing service. Through this service, CFS received the tax monies its clients (the employers) were required by law to withhold from their employees' pay.[1] Having received these tax monies, it was then the Ervastis' responsibility to timely prepare and file their clients' Employer's Quarterly Federal Tax Returns, also known as Forms 941, with the Internal Revenue Service ("IRS") and to make timely deposits with the IRS in the amount each Form 941 indicated was due.

Initially, the Ervastis maintained a single bank account and commingled the impounded tax monies with their general operations monies. At some point, the Ervastis opened a "tax account" into which the impounded tax funds were deposited. Their practice of utilizing impounded tax monies to cover operating expenses, however, did not end with the opening of the tax account. Unbeknownst to CFS's clients, the

_____

[1]Frequently, the Ervastis would receive a power of attorney to directly withdraw these funds from their clients' bank accounts.

Ervastis from time to time would take funds from the tax account and use them for operating expenses, such as meeting CFS's own payroll. At trial, the Ervastis characterized this practice as "borrowing from the float," that is, using the impounded tax monies during the period between its collection and its deposit with the IRS.[2]

Before long the "float" began to sink. CFS lacked adequate capital to meet its expenses and had chronic cash flow problems. Consequently, in many cases, the Ervastis' "borrowing" from the impounded tax monies began to stretch beyond the date the taxes were due to the IRS, the Ervastis already having spent the impounded tax monies by the time they were due to the IRS. Although the Ervastis continued to submit the Forms 941 on time, those filings often were not accompanied by a corresponding tax deposit. On many occasions, the Ervastis misrepresented that the money due had been timely deposited when it had not. Indeed, Mrs. Ervasti signed and submitted many Forms 941 falsely indicating that the amount due had been timely paid. Likewise, when the Forms 941 were filed, the Ervastis notified their clients that the taxes had been timely paid, when they often had not.

This course of conduct had several consequences. The late deposits triggered the IRS's internal federal tax deposit alerts and the IRS began to investigate why CFS's clients had not deposited the tax funds their Forms 941 claimed they had. In addition, IRS computers began to churn out "large stacks" of late payment notices to CFS and its clients indicating the payment discrepancies. Not surprisingly, clients who received

---

[2]We note that "borrowing from the float" appears to be a broader concept than "investing the float," a practice also raised at trial. "Investing the float" refers to benefitting from the "use" of the impounded tax monies in the narrow sense of receiving the <u>interest</u> that accrues on them before they are deposited with the IRS—but not actually spending the underlying impounded tax monies themselves. The record does not indicate whether the Ervastis ever invested the impounded tax monies. Even if they did, this prosecution did not target such conduct. We express no opinion as to the legality or prudence of either "borrowing from" or "investing" the float.

copies of these notices—or who were investigated by the IRS—became concerned. After all, according to the testimony of numerous former CFS clients, they had turned over tax monies to the Ervastis with the understanding that the IRS would be paid properly and timely; that was the very purpose of hiring the Ervastis to process their tax deposits. Moreover, as employers, CFS's clients ultimately were liable for the taxes due.

In response to client and IRS inquiries, the Ervastis lied and made up "lame excuses," Brief of Appellant Deniene Ervasti at 12,[3] often blaming the IRS notices on trumped-up computer problems or nonexistent IRS mistakes. Moreover, the Ervastis denied using impounded tax monies to fund CFS's operating expenses. Asked why they would lie to their clients, Mrs. Ervasti testified, "I wanted to pacify them and . . . retain their business." Tr. at 998. Indeed, up to the end, the Ervastis continued to seek and accept clients' impounded tax monies and use them for purposes other than paying the taxes.

Besides the legal implications, the Ervastis' conduct had disastrous financial consequences for CFS. The late deposits to the IRS triggered a cascade of penalties and interest. The situation spiraled downward as the Ervastis used incoming impounded tax monies to pay the interest and penalties on the late deposits. As a result, CFS made still more late payments to the IRS, thus triggering even more penalties and interest liability. Though CFS's clients became unwitting "investors" in CFS, Mr. Ervasti was never able to secure any legitimate outside financing to fund CFS's operations. By September 1995, CFS's finances were collapsing. The Ervastis had fallen nearly two quarters behind in the tax payments for many clients and sought

---

[3]Although Mr. and Mrs. Ervasti were represented by separate counsel, they elected to share the briefing of certain common issues on this appeal. See Fed. R. App. P. Rule 28(i) ("In a case involving more than one appellant . . . any party may adopt by reference a part of another's brief.").

bankruptcy protection for CFS.

While the Ervastis did pay the taxes, penalties, and interest owed with respect to some of their clients (especially those who complained earliest and most vociferously), most clients did not fare so well. By the end, more than 100 clients still owed money to the IRS. Many former CFS clients ended up, in essence, paying their taxes twice: first to the Ervastis and again to the IRS (with penalties and interest).[4] A September 1995 accounting, compiled under Mr. Ervasti's direction to assess CFS's debt for the bankruptcy proceedings, revealed that the difference between the amount of impounded tax monies CFS received from its clients and the amount the Ervastis actually deposited with the IRS was $5,747,478.88.

The IRS investigated the Ervastis' conduct and a grand jury ultimately issued a ten-count superseding indictment. Both Mr. and Mrs. Ervasti were charged in Counts 1 through 5. Count 1 charged conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (1994) for defrauding CFS's clients of money, property, and the intangible right of honest services. Counts 2 through 4 were substantive counts of mail fraud under 18 U.S.C. § 1341 (1994) in furtherance of the conspiracy. Count 5 charged a conspiracy to impede or impair the due administration of the IRS in the ascertainment, computation, assessment, and collection of taxes in violation of 18 U.S.C. § 371. In addition, Mrs. Ervasti alone was charged, under Counts 6 through 10, with five counts of aiding a false tax return in violation of 26 U.S.C. § 7206(2) (1994).

After hearing the evidence at trial—including testimony from many of CFS's former clients and employees, as well as from the defendants themselves—a jury convicted the Ervastis on all counts. The District Court sentenced Mr. Ervasti to sixty-three months imprisonment for Counts 1 through 5. Mrs. Ervasti was sentenced to

[4]Some of CFS's former clients were forced to close their businesses as a result of the Ervastis' conduct.

forty-eight months imprisonment for Counts 1 through 5 and thirty-six months for Counts 6 through 10, to be served concurrently.[5] In addition, the Ervastis were ordered to pay $5,747,478.88 in restitution and to comply with certain terms of supervised release. The Ervastis appeal their convictions and sentences.

## II.

We turn first to the Ervastis' challenge to their convictions under Counts 1 through 4, for conspiracy to commit mail fraud and for three substantive counts of mail fraud. The defendants dispute two jury instructions and challenge the sufficiency of the evidence supporting their convictions. We review each of these matters in turn.

## A.

The defendants contend that the District Court erred in refusing to instruct the jury in the precise language that appeared in United States v. Jain, 93 F.3d 436, 442 (8th Cir. 1996), cert. denied, 520 U.S. 1273 (1997): "The essence of a scheme to defraud is an intent to harm the victim." Although the defendants requested this instruction, the District Court declined to give it, observing that this language does not appear as an element in the mail fraud statute and reasoning that, in Jain, we were "making a distillation . . . not setting out one of the elements." Tr. at 1070.

Instead, the District Court instructed the jury, inter alia, that "[t]o act with intent to defraud means to act knowingly and with the intent to deceive someone for the

_____

[5]The Ervastis' sentencing, which occurred on February 10, 1999, is governed by the United States Sentencing Commission Guidelines Manual, effective November 3, 1998. See U.S. Sentencing Guidelines Manual (hereinafter "U.S.S.G.") § 1B1.11(a) (1998) (stating that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced," unless it would violate the Ex Post Facto Clause of the United States Constitution).

purpose of causing some financial loss or loss of property or property rights, loss of an intangible right to honest services to another, or bringing about some financial gain to one's self or another to the detriment of a third party." Tr. at 1218. This instruction is nearly identical to the corresponding part of the mail fraud instruction in the Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit (1997).

It is axiomatic that federal district courts have wide discretion in crafting appropriate jury instructions. See, e.g., United States v. Clapp, 46 F.3d 795, 803 (8th Cir. 1995). In particular, "the district court is afforded considerable discretion in choosing the form and language of jury instructions." United States v. Jerde, 841 F.2d 818, 820 (8th Cir. 1988). "A defendant is not entitled to a particularly worded instruction where the instructions given adequately and correctly cover the substance of the requested instruction." United States v. Kouba, 822 F.2d 768, 771 (8th Cir. 1987), quoted in Jerde, 841 F.2d at 823. We are satisfied that, at least in these circumstances, instructing the jury that it must find that the defendants intended to cause "loss" or "detriment" in order to convict them of mail fraud adequately and correctly covers the substance of the requested instruction, i.e., that intent to harm is the essence of a scheme to defraud.

In any event, our focus on "harm" being an "essential" feature of a scheme to defraud in Jain arose in a context that is inapposite here. In Jain, a psychologist was charged with engaging in a fraudulent referral fees scheme. Unlike in the instant case, however, there was no allegation in Jain that the defendant had given his patients inadequate services and "there was no evidence that any patient suffered tangible harm." Jain, 93 F.3d at 441. Accordingly, we concluded that to prevail under 18 U.S.C. § 1341 as expanded by 18 U.S.C. § 1346 (1994),[6] "[w]hen there has been no actual harm, 'the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent.'" Id. at 442 (quoting United States v.

_____

[6]See Part II.B., infra.

D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994)). Thus, <u>Jain</u> was an exception to the ordinary rule that the scheme itself may provide evidence of the defendant's intent to defraud. <u>See</u> <u>United States v. Whitehead</u>, 176 F.3d 1030, 1038 (8th Cir. 1999). The concerns present in <u>Jain</u> are not present here, where CFS's clients collectively suffered actual loss and detriment (that is, harm) in excess of $5.7 million. We find no error in the instruction.

B.

We turn next to the Ervastis' claim that the government failed to prove they violated a fiduciary duty (or, as Mrs. Ervasti's counsel asserted at oral argument, "some similar duty"), a showing that they assert is necessary for a mail fraud conviction under § 1341 as enlarged by § 1346. In particular, the Ervastis claim that the District Court erred in giving the following jury instruction: "[O]ne whose business allows him or her to handle the money or property of another must act with responsibility and loyalty. Such a person must subordinate his or her individual property interests to their duty, to the principle [sic] whenever the two conflict." Tr. at 1219. The defendants claim that giving this instruction was an abuse of the District Court's discretion because it "instruct[ed] the jury that it could find a fiduciary duty in this case where none existed as a matter of law and which the Government had not attempted to prove." Brief of Appellant Deniene Ervasti at 17. We think this issue is meritless.

The mail fraud statute prohibits use of the mails to effectuate "any scheme or artifice to defraud." 18 U.S.C. § 1341. Before the enactment of § 1346, this concept was limited to monetary or tangible loss—such as the $5.7 million in losses suffered by CFS's former clients. <u>See</u> <u>Jain</u>, 93 F.3d at 441 (discussing effect of enactment of § 1346 on interpretation of § 1341). By enacting § 1346, Congress enlarged the definition of "scheme or artifice to defraud" under § 1341 to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

We reject the Ervastis' contention that § 1346 requires the breach of a fiduciary duty. While the defendants are correct that our decision in United States v. Pennington, 168 F.3d 1060 (8th Cir. 1999), involved § 1346 and the breach of a fiduciary duty (and while we do not doubt that a defendant's breach of a fiduciary duty in proper circumstances may be a powerful indication that he also has deprived another of the right of honest services), the breach of a fiduciary duty is not a necessary element of § 1346. Certainly nothing in Pennington or in the language of either § 1341 or § 1346 suggests the contrary. Accord United States v. Sancho, 157 F.3d 918, 920-21 & n.1 (2d Cir. 1998) (holding that § 1346 does not require proof of fiduciary relationship and finding no mail fraud or wire fraud case where conviction was vacated because no fiduciary relationship existed), cert. denied, __ U.S. __, 119 S. Ct. 1076 (1999). Accordingly, the Government was not required to prove the existence or breach of a fiduciary duty to show a violation of § 1341 as expanded by § 1346, and the instruction was not defective for failing to put the prosecution to such proof.

C.

We turn to the Ervastis' final challenge to their convictions on Counts 1 through 4: that there was insufficient evidence to support those convictions. The Ervastis assert that they just "ended up piloting a sinking ship" and that "no reasonable jury could come to the conclusion that [they] intended the harm that [their] clients sustained." Brief of Appellant Deniene Ervasti at 17. We disagree. We must uphold a jury's verdict if, drawing all reasonable inferences in favor of the verdict, "there is an interpretation of the evidence that would allow a reasonable-minded jury to find the defendants guilty beyond a reasonable doubt." United States v. Vig, 167 F.3d 443, 447 (8th Cir.), cert. denied, __ U.S. __, 120 S. Ct. 146, 314 (1999).

The jury was not obligated either to believe the Ervastis' claims that they never intended to defraud anyone or to accept the Ervastis' interpretation of the evidence. See United States v. Baker, 98 F.3d 330, 338 (8th Cir. 1996) ("'The evidence need not

exclude every reasonable hypothesis except guilt.'" (quoting United States v. Erdman, 953 F.2d 387, 389 (8th Cir.), cert. denied, 505 U.S. 1211 (1992))), cert. denied, 520 U.S. 1179 (1997); United States v. Ireland, 62 F.3d 227, 230 (8th Cir. 1995) ("It is the jury's job to judge the credibility of witnesses, and to resolve contradictions in the evidence."). For example, intent to defraud is not necessarily disproved by Mr. Ervasti's bare claim that "[t]here was never any conscious decision to use the float. The money was just there and it got used." Tr. at 907. The jury was free to believe—or reject—this explanation. Certainly a jury reasonably could conclude that impounded tax funds do not "get used" for other purposes without someone's intending that they be so used.

Absent an outright admission of intent to defraud, the requisite intent can be shown by circumstantial evidence. See United States v. Blumeyer, 114 F.3d 758, 767 (8th Cir.) ("[T]he government need not prove intent directly; the jury may infer intent to defraud from circumstantial evidence."), cert. denied, 522 U.S. 938, 1008 (1997). Provided the victims suffered some tangible loss—as they did here—"[t]he scheme itself often serves as evidence of a defendant's intent to defraud." Whitehead, 176 F.3d at 1038; accord United States v. Yoon, 128 F.3d 515, 524 (7th Cir. 1997) ("While it is true that there is no evidence that [the defendant] said, 'I intend to defraud these banks,' the sheer numbers of checks and amounts of money involved in this scheme during the ten-month period provide a surrogate for [defendant's] knowledge."); D'Amato, 39 F.3d at 1257 ("When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself."). The Ervastis' conduct and the nature of the scheme as described above provide circumstantial evidence of fraudulent intent, and we are thoroughly convinced there is sufficient evidence from which a jury could reasonably have concluded that the Ervastis had the requisite intent to defraud.

III.

We turn next to the Ervastis' assertion that Count 5 did not sufficiently charge, and the evidence at trial did not sufficiently show, that they intended to conspire to impede and impair the IRS in violation of 18 U.S.C. § 371.  Akin to their claims regarding Counts 1 through 4, the Ervastis contend that the evidence shows that they were only trying to maintain their business and that they never meant to impede the IRS's collection of taxes.

## A.

The conspiracy to defraud clause of § 371 prohibits conspiracies to defraud the United States by, among other things, "impairing, obstructing, or defeating the lawful function of any department of the Government."  United States v. Derezinski, 945 F.2d 1006, 1011 (8th Cir. 1991) (quoting Dennis v. United States, 384 U.S. 855, 861 (1966) (quoting Haas v. Henkel, 216 U.S. 462, 479 (1910))) (internal quotation marks omitted).  At issue here is a conspiracy to defraud the IRS in the function of assessing and collecting taxes, also known as a Klein conspiracy.  See United States v. Klein, 247 F.2d 908 (2d Cir. 1957), cert. denied, 355 U.S. 924 (1958); see also Derezinski, 945 F.2d at 1010 & n.4.  According to the defendants, the indictment is insufficient because it failed to adequately charge that the Ervastis had the purpose or object of impeding the IRS.

This argument is frivolous.  Count 5 alleges that the defendants "did unlawfully, willfully and knowingly combine, conspire, confederate and agree . . . to impede and impair the due administration of the Internal Revenue Code [sic] of the United States in the ascertainment, computation, assessment and collection of taxes, all in violation of Title 18, United States Code, Section 371."  Superseding Indictment ¶ 26.  Count 5 further specifies that:

> The object of the conspiracy was to enable [the Ervastis] to use CFS's clients' tax money for the defendants' own purposes, by either delaying

payment or not making any payment to the [IRS] for the clients' employment tax liability and by providing false information to the [IRS] and CFS's clients, thus impeding and impairing the [IRS's] collection of CFS's clients' employment tax liability.

Id. ¶ 27.  The indictment explicitly charges that the Ervastis agreed to impede or impair the IRS, and thus it fairly informed them of the charged offense.

## B.

The Ervastis also assert that there is insufficient evidence to uphold their conviction for the Klein conspiracy because the true purpose and object of their actions was not to impede or impair the IRS but "to keep CFS running on a day-to-day basis and to keep all the clients happy so that CFS could either attract new investors or otherwise get out of the hole in[to] which it was inexorably sinking."  Brief of Appellant Deniene Ervasti at 21.  The Ervastis claim any impact on the IRS was an "inadvertent consequence" of their wholesome desire to keep their business afloat.  Id. We disagree.

The requisite agreement "need not be express, but rather can be an informal tacit understanding between the coconspirators. . . . [and] can be proved entirely by circumstantial evidence."  United States v. Murphy, 957 F.2d 550, 552 (8th Cir. 1992). We have described above the high burden a defendant bears in challenging the sufficiency of the evidence supporting his conviction.  We agree with the First Circuit that while "[v]olumes could be written . . . for cases like ours . . . a more compact solution is at hand:  where the conspirators have effectively agreed to falsify IRS documents . . . the factfinder may infer a purpose to defraud the government by interfering with IRS functions."  United States v. Goldberg, 105 F.3d 770, 774 (1st Cir. 1997).  Here, the numerous purposefully falsified Forms 941, as well as the Ervastis' misrepresentations to the IRS and to their clients that taxes had been paid

when they had not, provide sufficient evidence from which a factfinder reasonably could conclude that the Ervastis had a purpose and object to impede and impair the IRS in the performance of its duties. The evidence in support of the <u>Klein</u> conspiracy is sufficient to support the jury's verdict.

IV.

The Ervastis challenge the District Court's denial of their motion to suppress all evidence obtained when special agents of the IRS criminal division executed a search warrant at CFS's offices on October 16, 1995. Defendants claim the warrant was facially overbroad because it failed to sufficiently particularize the things to be seized and that the good-faith exception of <u>United States v. Leon</u>, 468 U.S. 897 (1984), cannot remedy the warrant's facial defects and save the seized evidence from suppression. Without reaching the overbreadth issue, the District Court found the seized evidence to be admissible under <u>Leon</u> because the officers were acting in good faith reliance on a facially valid warrant. "We review facts supporting the denial of a motion to suppress evidence for clear error and review the legal conclusions based on those facts <u>de novo</u>." <u>United States v. Pitts</u>, 173 F.3d 677, 680 (8th Cir. 1999).

Here, the IRS was investigating potential mail fraud and tax fraud. Based on their interviews with multiple CFS clients and employees, the IRS believed the fraud involved misappropriating client funds, making transfers between bank accounts, and concealing activities through false paperwork. Because the Ervastis delegated relatively little of their fraudulent conduct to subordinates and offered little cooperation with the investigation, it was not possible for the IRS to discern the precise parameters of the potential crimes. Accordingly, the search warrant was extensive and inclusive.[7] Nevertheless, we conclude that this warrant was not facially

---

[7]The warrant authorized the seizure of:

invalid.  It was sufficiently particular in these circumstances, where authorities were trying to uncover the precise details of a scheme characterized by concealment, to meet the constitutional standards of specificity.  Having concluded that the warrant was not facially invalid, and discerning no basis for disturbing the District Court's finding that the officers here were acting in good-faith reliance on it, we conclude there was no reason to suppress the evidence seized pursuant to the warrant.

V.

We look next at the Ervastis' claim that the District Court erred in failing to dismiss Counts 1 and 5 because they both involve the violation of 18 U.S.C. § 371 and the same conspiracy and thus violate the Constitution's ban on placing defendants in double jeopardy.  We review de novo the denial of a motion to dismiss an indictment

_____

Books, records, ledgers, documents, financial instruments, deposit slips, canceled checks, bank statements, passbooks, invoices, bills, telephone toll records and billing statements, utility bills and insurance policies, loan payment records, correspondence, money order receipts, cashiers checks, federal and state tax returns on other tax forms, other financial records, books and data, paper, tickets, notes schedules and receipts, address books, telephone books, Rolodex indices and papers, client lists and, [sic] IRS documents related to CFS clients, computer and computer devices including but not limited to any electronic, magnetic, optical, electrochemical, or other high speed data processing devices; communication facilities directly relating to or operating in conjunction with such devices; computer software programs, together with instruction manuals and information contained on paper, in handwritten, typed, photocopied or printed form, or stored on computer printouts, magnetic tapes, cassettes, discs, diskettes, or other medium; and other evidence and instrumentalities, all of which are evidence of violations of Title 18, [U.S.C.], Sections 1341 and 1343, and Title 26, [U.S.C.], Section 7212(a), for the period of 1991 to present.

on double jeopardy grounds.  See United States v. Bennett, 44 F.3d 1364, 1368 (8th Cir.), cert. denied, 515 U.S. 1123, 1145 (1995); 516 U.S. 828 (1995).  The question is of limited practical importance in this case, because the Ervastis' sentences on these two counts run concurrently, and concurrently with their sentences on the other counts.  The only additional punishment they have received with respect to Counts 1 and 5 is a $50 special assessment on each of these counts.

The Double Jeopardy Clause[8] "protects against multiple punishments for the same offense."  North Carolina v. Pearce, 395 U.S. 711, 717 (1969).  "In order to support a claim of double jeopardy, a defendant must show that the two offenses charged are in law and fact the same offense."  Bennett, 44 F.3d at 1368.  Our starting point in determining whether Counts 1 and 5 are the "same offense" for double jeopardy purposes is the same elements analysis of Blockburger v. United States, 284 U.S. 299 (1932), which provides:  "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  284 U.S. at 304.

We are satisfied that Counts 1 and 5 charge separate and distinct violations of separate and distinct provisions of § 371.  Though it is not divided formally into subsections, § 371 plainly establishes two offenses:

> If two or more persons conspire either to commit any offense against the United States or  to defraud the United States . . . each shall be fined under this title or imprisoned for not more than five years or both.

18 U.S.C. § 371 (emphasis added); cf. Derezinski, 945 F.2d at 1009-10 (rejecting defendants' claims that they should have been charged under the "offense" provision

---

[8]This clause provides:  "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ."  U.S. Const. amend. V.

of § 371 rather than its "defraud" provision); Murphy, 957 F.2d at 553 (noting § 371 "proscribes two distinct types of conspiracies").[9]  Here, Count 1 charges a violation of the "offense" provision of § 371:  conspiring to commit the substantive offense of mail fraud by a scheme or artifice to deprive CFS's clients of money, property, and the intangible right of honest services through use of the mails.  Count 5 charges a violation of the "defraud" provision of § 371:  conspiring to defraud the United States by impeding and impairing the due administration of the IRS in the ascertainment, computation, assessment, and collection of taxes, that is, the Klein conspiracy.  It thus is apparent that the Blockburger test must govern the double-jeopardy issue the Ervastis have raised.[10]

_____

[9]We acknowledge an apparent disagreement in the circuits on this issue. Compare United States v. Thompson, 814 F.2d 1472, 1475-77 (10th Cir.) (discerning no colorable double jeopardy claim notwithstanding that, like here, same agreement gave rise to first charge of conspiracy to commit mail fraud under "offense" provision of § 371 and second charge of conspiracy to impede lawful function of United States under "defraud" provision of § 371), cert. denied, 484 U.S. 830 (1987), with United States v. Smith, 891 F.2d 703, 712 (9th Cir. 1989) (concluding, in holding that single indictment count charged under both provisions of § 371 was not duplicitous, that "[a]lthough there is no helpful legislative history, the two clauses of [§ 371] should be interpreted to establish alternate means of commission, not separate offenses" and that "[i]t would be strange to infer that Congress intended to punish twice a conspiracy that violates both clauses.  Where a single criminal statute prohibits alternative acts, courts should not infer the legislature's intent to impose multiple punishment."), amended as to form of opinion only, 906 F.2d 385 (9th Cir. 1990), and cert. denied, 498 U.S. 811 (1990).

[10]The Ervastis correctly point out that the Supreme Court has found a double jeopardy violation where the defendants were charged with seven separate conspiracy counts, all involving the same conspiracy, under the (nearly identical) statutory predecessor to § 371.  See Braverman v. United States, 317 U.S. 49, 52-53 (1942). Braverman is distinguishable, however, because all seven conspiracy counts were charged for a single agreement under the "offense" provision; none was charged under the "defraud" provision.  Braverman acknowledged the continuing vitality of Blockburger where the same conspiracy violates two separate statutory provisions. 317

-16-

Applying the <u>Blockburger</u> analysis to determine whether these counts require proof of an element the other does not, we conclude they do: "Conspiracy to commit mail fraud requires the Government to show an act constituting use of the mails in furtherance of the conspiracy. Proof of conspiracy to defraud the United States has no requirement regarding the use of the mails, but requires proof of an agreement to specifically defraud the United States." <u>United States v. Thompson</u>, 814 F.2d 1472, 1477 (10th Cir.), <u>cert. denied</u>, 484 U.S. 830 (1987). Accordingly, Counts 1 and 5 meet the <u>Blockburger</u> standard. We therefore hold that Counts 1 and 5 are not in law and fact the same offense and do not place the defendants in double jeopardy.

## VI.

We turn next to Mrs. Ervasti's contention that the District Court erred in refusing to instruct the jury that there is a "good faith" defense to Counts 6 through 10—those counts involving her aiding and abetting the filing of false Forms 941. Counts 6 through 10 allege violations of § 7206(2) of the Internal Revenue Code which provides criminal liability for any person who "[w]illfully aids or assists in . . . the preparation . . . under . . . the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter." 26 U.S.C. § 7206(2). A good faith belief that one's conduct does not violate the tax laws negates the willfulness element of this offense. <u>See</u> <u>Cheek v. United States</u>, 498 U.S. 192, 201-203 (1991); <u>United States v. Brooks</u>, 174 F.3d 950, 955 (8th Cir. 1999).

"[A] party is entitled to an instruction on his theory of the case, provided the instruction is . . . supported by the evidence . . . ." <u>Jerde</u>, 841 F.2d at 820. Having

---

U.S. at 54. Our question of whether the "offense" and "defraud" provisions of § 371 constitute two separate offenses for double jeopardy purposes was not before the <u>Braverman</u> Court.

closely reviewed the record, we agree with the District Court that "[t]here is no evidence that there was a good faith misunderstanding of the Internal Revenue laws" and that Mrs. Ervasti "said she knew she was making a false statement and she was lying on the form." Tr. at 1085, 1086. While Mrs. Ervasti contends that she thought it was "fine" to deposit funds after the Forms 941 were filed, she candidly conceded that she knew it was wrong to prepare Forms 941 "which [were] fraudulent or [were] false as to any material matter." 26 U.S.C. § 7206(2).

We have explained that the concern underlying the good-faith defense in tax cases is that defendants not be convicted for a misapprehension of a complex tax statute they did not believe criminalized their conduct. See United States v. Hildebrandt, 961 F.2d 116, 119 (8th Cir.) (finding no reversible error in not giving Cheek "good faith" instruction where defendant was convicted under general criminal statute's "straightforward prohibition against making false, fictitious, or fraudulent statements to the government" in filing numerous false federal tax forms), cert. denied, 506 U.S. 878 (1992). The District Court did not abuse its discretion in refusing to instruct the jury on "good faith" as requested by Mrs. Ervasti.

We note that the District Court instructed the jury, among other things, that Counts 6 though 10 "call for willful violation of the law" and that "[a]n act is done willfully if it is done voluntarily and intentionally with the purpose of violating a known legal duty." Tr. at 1224, 1225. Under that instruction, the jury could not have found Mrs. Ervasti guilty unless it believed she willfully violated the tax laws and, thus, did not act in a good-faith misapprehension of the law. Hence, even assuming, arguendo, error by the District Court in refusing to give a "good faith" instruction, the error was harmless.

VII.

Mr. Ervasti challenges a two-level sentencing enhancement for being "an

organizer, leader, manager, or supervisor" of the scheme for which he and his wife were convicted. U.S.S.G. § 3B1.1(c). The District Court found that Mr. Ervasti "was not just [CFS's] CEO in title, he was its leader in all respects." Sentencing Tr. at 36. In explaining its reasoning to Mr. Ervasti, the District Court observed: "[Y]ou were fully in charge, and you were running this operation, and it operated according to your will and to your whim." Sentencing Tr. at 54. Recognizing that a district court is in a far better position than are we to observe and evaluate all of the evidence, we reverse a district court's determination of a defendant's role in the offense under § 3B1.1 only if it is clearly erroneous. See United States v. Rodamaker, 56 F.3d 898, 902 (8th Cir. 1995). "We have construed the definition of leadership or organizational role broadly. . . . While control of other participants is an important factor, section 3B1.1 focuses on the 'relative responsibility within a criminal organization.'" United States v. Mayer, 130 F.3d 338, 340 (8th Cir. 1997) (quoting United States v. Bush, 79 F.3d 64, 67 (7th Cir. 1996)); see U.S.S.G. § 3B1.1 commentary (background) ("This adjustment is included primarily because of concerns about relative responsibility."). Having reviewed the record carefully, we cannot say that the District Court clearly erred in enhancing Mr. Ervasti's offense level for playing a supervisory role in the offense.

## VIII.

Mrs. Ervasti challenges the District Court's calculation for sentencing purposes of the tax loss amount applicable to Counts 6 through 10 for aiding in the filing of false Forms 941 on behalf of CFS's clients and intentionally failing to deposit the funds those forms indicated had been paid to the IRS, all in violation of 18 U.S.C. § 7206(2). Under the Sentencing Guidelines, the base offense level with respect to Counts 6 through 10 depends upon the amount of tax loss. See U.S.S.G. §§ 2T1.1, 2T1.4(a), 2T4.1. The Sentencing Guidelines instruct that, "[i]f the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted

had the offense been successfully completed)." Id. § 2T1.1(c)(1). Relevant conduct for sentencing is viewed broadly: "In determining the total tax loss attributable to the offense . . . , all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." Id. § 2T1.1 commentary (n.2). Whether an act or omission is relevant conduct is a factual determination subject to review for clear error. See United States v. Georges, 146 F.3d 561, 562 (8th Cir. 1998).

After trial and an evidentiary hearing, the District Court determined that the amount of tax loss was the same as the fraud loss, $5,747,478.88. This amount corresponds to a base offense level of 22. See U.S.S.G. § 2T4.1(Q) (offense level 22 corresponds to tax loss of more than $5 million but less than or equal to $10 million). Mrs. Ervasti asks us to reject this finding and to distinguish between the "fraud loss," which she concedes to be $5,747,478.88, and the "tax loss" to which she does not ascribe a precise value.[11] Mrs. Ervasti argues that the "great majority" of the $5.7 million relates to third quarter 1995 liabilities that were not due and for which Forms 941 had not been filed—falsely or otherwise—at the time CFS went out of business in September 1995. Mrs. Ervasti contends that "[t]he proper tax loss calculation for this [tax loss] group . . . is the readily ascertainable sum based on the difference between the amounts shown on the returns [Mrs. Ervasti] filed and the sum of tax deposits she previously made for those taxpayers." Brief of Appellant Deniene Ervasti at 26. Although she does not quantify this "readily ascertainable sum," Mrs. Ervasti nonetheless claims that the District Court erred and "clearly prejudiced [her] because

_____

[11]We note that the District Court implored Mrs. Ervasti's counsel repeatedly to "[t]ell me . . . how much money is lost, in your, view, and then justify it." Sentencing Tr. 13. Mrs. Ervasti's counsel responded "[w]e do not know," id. at 14, but then contended that the bankruptcy court's calculation of $5.2 million should more accurately be $3.5 million, see id. at 14-16.

[this loss value] increased her sentencing offense level by one." Id. at 27.[12]

Even if we were convinced that Mrs. Ervasti had rebutted the government's showing that the tax loss was less than the $5.7 million and that she had given the court some basis to accept a different value, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 commentary (n.2). Even though CFS collapsed before the third quarter Forms 941 were actually filed and before any additional documents were actually falsified, we believe the District Court was well within its discretion to consider for sentencing purposes the overall scope of the unlawful scheme in assessing the amount of the tax loss for which Mrs. Ervasti is responsible.

IX.

The Ervastis also challenge the District Court's rulings on the extent to which they merit acceptance-of-responsibility sentencing reductions. Section 3E1.1(a) of the Sentencing Guidelines provides for a two-level decrease in a defendant's offense level if "the defendant clearly demonstrates acceptance of responsibility for his offense." Id. § 3E1.1(a). If a defendant receives a two-level reduction under § 3E1.1(a), he also receives an additional one-level reduction if he "has assisted authorities in the investigation or prosecution of his own misconduct" by either "(1) timely providing complete information to the government concerning his own involvement in the

---

[12]Apparently, then, Mrs. Ervasti is claiming the proper tax loss figure would be in the $2.5-5 million range. See U.S.S.G. § 2T4.1(P) (offense level 21 corresponds to tax loss of more than $2.5 million but less than or equal to $5 million). We note that in her reply, Mrs. Ervasti (apparently for the first time) asserts an even lower tax loss figure—$2.1 million, see Reply Brief of Appellant Deniene Ervasti at 9 n.3, corresponding to a lower offense level, see § 2T4.1(O) (offense level 20 corresponds to tax loss of more than $1.5 million but less than or equal to $2.5 million).

offense" or "(2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." Id. § 3E1.1(b). We review a sentencing court's decision to award or deny an acceptance-of-responsibility reduction for clear error. See United States v. Colbert, 172 F.3d 594, 597 (8th Cir. 1999); cf. U.S.S.G. § 3E1.1 commentary (n.5) ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.").

A.

The District Court did not grant Mr. Ervasti any acceptance-of-responsibility sentencing reduction. Mr. Ervasti contends that he should have received a full three-level reduction due to the purportedly "unique" circumstances of his case, including the fact that he twice attempted to plead guilty before trial. While we agree that attempting to plead guilty may provide "some evidence" of acceptance of responsibility, an attempt to plead guilty is not a guarantee of receiving the adjustment. See U.S.S.G. § 3E1.1 commentary (n.3) ("A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.").

The fundamental inquiry under § 3E1.1(a) is whether the defendant "clearly demonstrates" acceptance of responsibility for "his offense." When a defendant denies having the requisite mental state for the crime for which he was convicted, a district court is well within its discretion to determine that the defendant has failed to "clearly demonstrate[] acceptance of responsibility for his offense." Id. § 3E1.1(a) (emphasis added); see United States v. Makes Room, 49 F.3d 410, 416 (8th Cir. 1995) (upholding district court's denial of § 3E1.1(a) reduction where defendant admitted to facts underlying conviction but denied having requisite mens rea of the offense of conviction). At trial, Mr. Ervasti repeatedly denied having any intent to defraud CFS's clients and claimed entitlement to use the impounded tax monies as he pleased. At sentencing, while Mr. Ervasti did state the words "I apologize," he expressly limited

his regret to not having found an investor to bail out the scheme. In any event, the District Court was not required to accept Mr. Ervasti's bare claims of remorse. Having the benefit of observing Mr. Ervasti's demeanor, the District Court concluded, "I have no doubt you feel bad you've been caught . . . . <u>But there isn't a bit, not a[n] ounce of contrition in you</u>." Sentencing Tr. at 63 (emphasis added). We have reviewed the record closely and see no basis for disturbing this conclusion.

We have remanded for reconsideration of a sentence where it appeared that the district court failed to fully consider a defendant's attempt to plead guilty. <u>See</u> <u>United States v. Guerrero-Cortez</u>, 110 F.3d 647, 655-56 (8th Cir.), <u>cert. denied</u>, 522 U.S. 1017 (1997).[13] It is not logically inconsistent, however, for a district judge both to deny a defendant's attempt to plead guilty and to determine later, at sentencing, that the defendant failed to sufficiently accept responsibility to merit a reduction in his offense level. A defendant's willingness to plead guilty may be motivated by myriad factors, and may not necessarily be attended by the defendant's clear acceptance of guilt. <u>Cf.</u> <u>United States v. Cojab</u>, 978 F.2d 341, 344 (7th Cir. 1992) (upholding district court's finding that defendant lacked sufficient acceptance of responsibility to warrant § 3E1.1 reduction where defendant pled guilty to obtain dismissal of charges against his wife, not because of affirmative recognition of his own guilt) (applying pre-1992 Guidelines). We see no basis for saying that the District Court clearly erred when it made its core determination that Mr. Ervasti's remorse did not meet the standards of § 3E1.1(a). <u>See</u> <u>Colbert</u>, 172 F.3d at 597 (stating this determination "'is

[13]In <u>Guerrero-Cortez,</u> the defendant had attempted to plead guilty to the charge for which he was ultimately convicted on two occasions immediately following his indictment; he "consistently and repeatedly admitted" his guilt thereafter. 110 F.3d at 655. Noting that the district court clearly erred in incorrectly believing that the defendant had not indicated any acceptance of responsibility until after trial, we remanded to give the district court an opportunity to review the strength of the defendant's earlier admissions. <u>Id.</u> at 655-56. It remained the district court's duty to evaluate the quality of the defendant's remorse.

entitled to great deference and should be reversed only if it is so clearly erroneous as to be without foundation.'" (quoting United States v. Morris, 139 F.3d 582, 584 (8th Cir. 1998) and omitting internal quotation marks and citation)).

Given that the additional one-level adjustment under § 3E1.1(b) is contingent on a defendant's receiving the two-level adjustment under § 3E1.1(a), and having found that the District Court properly denied the § 3E1.1(a) reduction, we conclude that it properly denied the § 3E1.1(b) reduction as well. See Makes Room, 49 F.3d at 417.

## B.

Mrs. Ervasti received a two-level offense reduction for acceptance of responsibility under § 3E1.1(a), but the District Court declined to grant the additional one-level reduction available under § 3E1.1(b) for reasons that are not expressed in the record. Mrs. Ervasti claims entitlement to a full three-level reduction because she twice attempted to enter a plea of guilty before trial, both of which the District Court rejected. If all of the conditions of § 3E1.1(b)(2) are met, a defendant is entitled to the additional one-level reduction. See United States v. Rice, 184 F.3d 740, 742 (8th Cir. 1999) ("If the sentencing court finds that the defendant accepted responsibility for his or her offense and entered a timely guilty plea, then the defendant is automatically entitled to the full three-level reduction available under § 3E1.1.").[14]   All of the

---

[14]The government claims Mrs. Ervasti is not entitled to the additional one-level reduction under § 3E1.1(b) because she never accepted full responsibility. We disagree. Once a district court finds acceptance of responsibility under § 3E1.1(a)—as the District Court did here—the additional § 3E1.1(b) reduction may not be denied on the theory that the defendant only partially accepted responsibility. Cf. United States v. Atlas, 94 F.3d 447, 452 (8th Cir. 1996) ("Nothing in the text of the guideline or its commentary suggests that the district court may deviate from the guidelines for 'partial acceptance' of responsibility."), cert. denied, 520 U.S. 1130 (1997).

conditions of § 3E1.1(b)(2) were not met here.

Receiving the additional one-level reduction depends upon a defendant's "timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." U.S.S.G. § 3E1.1(b)(2). In the first place, it seems likely that Mrs. Ervasti's plea attempts—one occurring a month and the other two weeks before trial, nearly a year and a half after the indictment, and following a flurry of pre-trial motions—would be considered untimely in the sense that they "did not serve the interests of judicial economy, and contained no hint that the government could ignore preparing for trial." United States v. Sandles, 80 F.3d 1145, 1151 (7th Cir. 1996). In any event, no guilty plea was ever entered here because the District Court found both plea attempts unacceptable.[15] It is appropriate for a district court to refuse the additional one-level reduction to a defendant who fails to offer an acceptable plea. Having not presented the District Court with an adequate plea, Mrs. Ervasti did not permit either the government or the court to avoid trial and thus did not meet the requirements of § 3E1.1(b)(2). Accordingly, we sustain the denial of the additional one-level reduction for Mrs. Ervasti.

X.

We turn next to Mr. Ervasti's claim that the District Court erred in imposing partially-consecutive sentences on Counts 1 through 5 and thereby sentencing him to longer than the sixty-month statutory maximum for each individual count. Section 5G1.2 of the Sentencing Guidelines deals with sentencing on multiple counts of

[15]The District Court rejected the first plea because the court was unwilling to be bound to imposing a six-month sentence on Mrs. Ervasti before learning more about the case. See Sentencing Tr. at 32. The District Court rejected the second plea attempt because it was "deeply troubled" at the time of the plea that Mrs. Ervasti was not sufficiently contrite. Id. at 45.

conviction and in relevant part provides: "If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run <u>concurrently</u>, except to the extent otherwise required by law." § 5G1.2(c) (emphasis added). On the other hand, "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run <u>consecutively</u>, but only to the extent necessary to produce a combined sentence equal to the total punishment." § 5G1.2(d) (emphasis added).

Here, each of the five counts for which Mr. Ervasti was convicted carries a sixty-month statutory maximum term of imprisonment. <u>See</u> 18 U.S.C. §§ 371; 1341. After considering all of the Sentencing Guidelines factors, the District Court ascertained Mr. Ervasti's adjusted combined offense level to be 24, placing him in a total punishment range of fifty-one to sixty-three months. The District Court determined that sixty-three months was the appropriate sentence within this range.

Mr. Ervasti posits that the "total punishment" referenced in § 5G1.2(c) and (d) is the guidelines range (here, fifty-one to sixty-three months). Accordingly, he argues, sixty months is "adequate," because it falls within this range (fifty-one to sixty-three). And if sixty months is "adequate . . . then the sentences on all counts shall run concurrently," U.S.S.G. § 5G1.2(c). The effect of such an interpretation is that the District Court could not sentence Mr. Ervasti to more than sixty months. If the "total punishment," however, is the District Court's actual determination of where a defendant falls within the guidelines range (here, sixty-three months), then sixty months is not "adequate" to achieve the "total punishment" and "the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." <u>Id.</u> § 5G1.2(d).

We apparently have not had occasion before now to confront this issue directly.

While § 5G1.2 does not expressly define "total punishment," its commentary instructs that "[t]he combined length of the sentences ('total punishment') is determined by the adjusted combined offense level," thereby suggesting that "total punishment" is the precise sentence determined by the sentencing judge from within the appropriate guidelines range. Indeed, both the Second and Fifth Circuits have so held. See United States v. Loeb, 45 F.3d 719, 723 (2d Cir.) (affirming sentence of seventy-one months under § 5G1.2(d) where guidelines range was fifty-seven to seventy-one months and statutory maximum on each of two counts was sixty months), cert. denied, 514 U.S. 1135 (1995); United States v. Kings, 981 F.2d 790, 797-98 (5th Cir.) (affirming sentence of 150 months under § 5G1.2(d) where guidelines range was 120-150 months, and where Count 1 carried a 120-month statutory maximum and Count 2 carried a thirty-six-month statutory maximum), cert. denied, 508 U.S. 953 (1993). We agree. Accordingly, the "total punishment" here, as determined by the District Court, is sixty-three months.

Having fixed the total punishment at sixty-three months, the District Court properly determined that the sentence imposed on Mr. Ervasti for Counts 1 and 2 would be sixty months (the highest statutory maximum of the five counts), to run concurrently. Given that the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment (i.e., sixty is less than sixty-three), "then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d). The District Court did just that by determining that the sentence imposed on one other count (Count 3) would be three months and would run consecutively to the sixty months (with respect to Counts 1 and 2) to equal the total punishment of sixty-three months. The District Court then correctly ordered that the sentences of the remaining counts (Counts 4 and 5) should run concurrently with the sentence on Count 3 so as not to exceed the total punishment. The District Court's application of § 5G1.2 is proper.

XI.

Mr. Ervasti points out an apparent typographical error in the Second Amended Judgment which incorrectly states the amount of restitution as being $7,747,478.88. We believe the record conclusively establishes that the correct figure is $5,747,478.88.[16]  This error now having been called to its attention, we trust that the District Court on remand will correct the judgment to reflect the true amount.  See Fed. R. Crim. P. 36 ("Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time . . . .").

XII.

Mr. Ervasti challenges the following condition of his supervised release: "Defendant is prohibited from incurring new credit charges or opening additional lines of credit without written approval from the [District Court], by applying through the probation officer." Second Amended Judgment at 3.  Mr. Ervasti contends that this condition is not reasonably related to the concerns at issue in his case and is a greater deprivation of his liberty than is reasonably necessary.  We disagree.  See U.S.S.G. § 5D1.3(d)(2) (recommending for supervised release—"[i]f an installment schedule of payment of restitution or a fine is imposed—a condition prohibiting the defendant from incurring new credit charges or opening new additional lines of credit without approval of the probation officer unless the defendant is in compliance with the payment schedule.").  Certainly a district court is not obligated to adopt this formulation verbatim and is entitled to tailor a condition to the needs of a particular case, consistent with§ 5D1.3(b) ("court may impose other conditions of supervised release").  Here, the District Court has ordered Mr. Ervasti to pay in excess of $5.7

---

[16]The last page of the Victim Restitution List appended to the Second Amended Judgment clearly indicates that the correct sum is $5,747,478.88.

million in restitution to more than 100 former clients of CFS. Given Mr. Ervasti's restitution obligation, it is not unreasonable for the District Court to insist that Mr. Ervasti refrain from taking on additional debt without permission. We hold that the District Court did not abuse its discretion in imposing this condition.

## XIII.

Having reviewed the record carefully, and having considered all the issues the Ervastis have raised, we find no basis for reversal. We affirm the defendants' convictions and sentences. We remand for correction of the clerical error with respect to the amount of restitution owed by Mr. Ervasti, so that the judgment shall show that amount to be $5,747,478.88.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.