**UNITED STATES of America**

v.

**Lawrence McGEEHAN, Appellant
at No. 05–1954.**

**Kathleen Haluska, Appellant
at No. 05–2446.**

**Nos. 05–1954, 05–2446.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 11, 2008.

Filed: Oct. 22, 2009.

Stephen H. Begler, Esquire (Argued), Pittsburgh, PA, for Appellant, Lawrence McGeehan.

John A. Knorr, Esquire, Pittsburgh, PA, for Appellant, Kathleen Haluska.

Michael L. Ivory, Esquire (Argued), Laura S. Irwin, Esquire, Office of the United States Attorney, Pittsburgh, PA, Attorneys for Appellee.

Before: SCIRICA, Chief Judge, RENDELL, and SMITH, Circuit Judges.*

## OPINION OF THE COURT

SCIRICA, Chief Judge.

This case requires us to address the scope of the legal theory of "honest services" fraud as applied to the conduct of persons who are not public officials. Defendants appeal their convictions of honest

---

* This case was originally submitted to the panel of Judges Rendell, Smith, and Becker. The coram was reconstituted to include Chief Judge Scirica after the death of Judge Becker.

services mail and wire fraud, 18 U.S.C. §§ 1341, 1343, 1346, and 2. We will affirm the judgment of the District Court on counts 3, 5, 6, 7, 8, and 9 because the Superseding Indictment is sufficient as to those counts. We will vacate the judgment on counts 10, 11, 13, 19, 20, 21, and 22 because the specific facts alleged in those counts of the Superseding Indictment do not constitute honest services fraud under § 1346.

## I.

The Ben Franklin Technology Center (BFTC) was a publicly-funded, non-profit corporation based in Pittsburgh, Pennsylvania. The Commonwealth of Pennsylvania created BFTC in the early 1980s—along with three other organizations—in an effort to encourage the development and commercialization of new technology. BFTC administered funds allocated by the Commonwealth through the Department of Community and Economic Development for economic development grants. The Commonwealth provided BFTC with these funds upon the condition that BFTC would spend them for approved purposes—such as grants and administrative expenses—and in conformity with the public mission of the organization. Any breach of BFTC's obligations to the Commonwealth could have jeopardized BFTC's state funding.

In 1995, BFTC entered into an agreement with the United States Navy to administer, on behalf of the Office of Naval Research, a project known as the National Network for ElectroOptics Manufacturing Technology (NNEOMT). The NNEOMT operated as a consortium: the Navy provided funding and the BFTC administered the program, including the disbursement of the appropriate amounts to subcontractors who were involved in the research and development of electro-optics technologies.

The NNEOMT Agreement provided that any funds allocated thereunder were to be used solely for administering NNEOMT.

From September of 1994 to July of 1998, Lawrence McGeehan was the President and Chief Executive Officer of BFTC, and Kathleen Haluska was the Vice–President and Chief Operating Officer. Together, McGeehan and Haluska were responsible for BFTC's daily operations and budget-related issues, including the administration of the NNEOMT Agreement.

A federal grand jury returned an Indictment charging McGeehan and Haluska (collectively, "defendants") with twenty counts of mail fraud in violation of 18 U.S.C. §§ 1341, 1346, and 2, and two counts of wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 2. A Superseding Indictment charged the same twenty-two counts of the Indictment and alleged an additional seven counts of fraud against the United States in violation of 18 U.S.C. §§ 1031 and 2.

The Superseding Indictment charged that, instead of faithfully managing BFTC's operations and fulfilling its administrative duties under the NNEOMT Agreement, McGeehan and Haluska caused the BFTC to use its funding from the Commonwealth and the Navy to pay for personal expenditures for themselves and others, and to cover costs that did not have a proper business purpose.

Counts 1 through 9 of the Superseding Indictment alleged that defendants devised a scheme to defraud BFTC of their honest services by misusing its funding, making "excessive expenditures for purposes such as lavish travel and entertainment," subverting its fiscal controls, improperly withholding information from BFTC's Board of Directors, and threatening, intimidating, and/or removing employees who questioned their misuse of authority.

Counts 10 through 22 of the Superseding Indictment alleged that BFTC, under the management of defendants, "owed the United States Navy a duty of honest services pursuant to its cont[r]act to administer NNEOMT," and that the defendants "devised a scheme and artifice to defraud the United States Navy of the intangible right of honest services owed to it by BFTC...." The Superseding Indictment further alleged that defendants defrauded the Navy of BFTC's honest services using mail and wire communications, which caused BFTC to use NNEOMT funds for unauthorized purposes.

Counts 23 through 29 alleged that defendants knowingly caused BFTC to execute a scheme and artifice to defraud and to obtain money and property from the Navy having a value in excess of one million dollars or more, in violation of 18 U.S.C. §§ 1031 and 2.

Defendants each filed pre-trial motions seeking, among other things, to dismiss the first twenty-two counts of the Superseding Indictment. McGeehan argued that the allegations in counts 1 through 9 were insufficient to state an honest services fraud offense because the Government did not allege that he profited illegally from his conduct, nor did the Government allege a violation of state law, which he claimed was "required as a limiting principle on [the] prosecution." McGeehan also contended that counts 10 through 22—the mail and wire fraud counts that named the Navy as the victim—were insufficient for an honest services fraud charge insofar as he owed no fiduciary duty to the Navy. Haluska's motion to dismiss echoed McGeehan's motion with respect to counts 10 through 22. With respect to counts 1 through 9, however, Haluska argued that honest services fraud is limited to situations in which a fiduciary fails to disclose a conflict of interest. Although she conceded that she had a fiduciary relationship with BFTC, she claimed that the Superseding Indictment did not reference a conflict of interest or allege that she had failed to disclose any such conflict. Defendants both argued that several of the counts in the Superseding Indictment were multiplicitous and sought their dismissal on that ground. Neither defendant moved to dismiss counts 23 through 29.

The District Court issued a memorandum opinion addressing defendants' motions to dismiss. The Court rejected the defendants' arguments regarding the scope of the mail and wire fraud statutes and denied their motions to dismiss insofar as they claimed that counts 1 through 22 failed to state an offense. It agreed, however, that counts 10 through 18 violated the rule against multiplicity. The District Court concluded that, although the Government had identified a different victim, the Government had impermissibly relied on the same mailings for counts 10 through 18 as it had for counts 1 through 9. The District Court subsequently afforded the Government the opportunity to choose which counts it wished to advance at trial. The Government selected counts 3, 5 through 11, 13, and 19 through 29.

■ Initially, both defendants pleaded not guilty, and the case proceeded to trial. During the course of the trial, however, Haluska entered an unconditional guilty plea. McGeehan proceeded to verdict and was convicted on counts 6, 8, 9, 10, 11, 13, and 19 through 29. The District Court sentenced both defendants to a 34–month term of imprisonment for each count, to be served concurrently, and imposed three years of supervised release. McGeehan and Haluska each filed timely notices of

appeal.[1] Upon a motion by the Government, we consolidated their appeals.[2]

## II.

■■ The sufficiency of an indictment presents a question of law over which we have plenary review. *United States v. Hodge*, 211 F.3d 74, 76 (3d Cir.2000). In evaluating an indictment's sufficiency, we consider "1) whether the indictment 'contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet,' and 2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Gov't of the V.I. v. Moolenaar*, 133 F.3d 246, 248 (3d Cir.1998) (quoting *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)). The sufficiency of an indictment may be challenged not only on the basis that it fails to charge the essential elements of the statutory offense, but also on the ground that "the specific facts alleged ... fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir.2002). Here, defendants contend that the specific facts alleged in the Superseding Indictment do not constitute honest services fraud.

## III.

■■ The federal mail and wire fraud statutes criminalize the use of the mails or wires to execute a "scheme or artifice to defraud." Specifically, 18 U.S.C. §§ 1341 and 1343 provide in part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... [uses the mails or wires, or causes their use] for the purpose of executing such scheme or artifice shall be fined under this title or imprisoned....

To establish a violation of these statutes, the Government must prove "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245, 261 (3d Cir.2001).

In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court considered the reach of § 1341 and acknowledged that the mail fraud statute had been "interpreted broadly." *Id.* at 356, 107 S.Ct. 2875. Indeed, § 1341 had been applied not only to schemes to defraud others of money and property, but had also been determined by each of the federal appellate courts presented with the issue to reach "schemes ... designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly." *Id.* at 358, 107 S.Ct. 2875. The use of the intangible rights doctrine in the private sector resulted in the prosecution of "purchasing agents, brokers, union leaders, and others with clear fiduciary duties to their employers or unions," who had been found "guilty of defrauding their employers or unions by accepting kickbacks or selling

---

1. Haluska's challenge to the sufficiency of the Superseding Indictment survived her guilty plea. *See, e.g., United States v. Hedaithy*, 392 F.3d 580, 586–89 (3d Cir.2004); *United States v. Panarella*, 277 F.3d 678, 680, 685 (3d Cir. 2002).

2. The District Court exercised jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.

confidential information." *Id.* at 363, 107 S.Ct. 2875 (Stevens, J., dissenting).

The *McNally* Court concluded, however, that the mail fraud statute's broad application was incompatible with its language. In an effort to avoid a construction of the statute that would leave "its outer boundaries ambiguous and involve[ ] the Federal Government in setting standards of disclosure and good government for local and state officials," *id.* at 360, 107 S.Ct. 2875, the Supreme Court determined that § 1341 was "limited in scope to the protection of property rights," *id.*, and did not prohibit schemes to defraud individuals, the people, or the government of the intangible right to honest services. *See Antico,* 275 F.3d at 261 n. 16.

■ In response to *McNally,* Congress enacted 18 U.S.C. § 1346,[3] which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." "Honest services fraud typically occurs in two scenarios: (1) bribery . . .; or (2) failure to disclose a conflict of interest resulting in personal gain." *Antico,* 275 F.3d at 262–63.

### A.

In our three principal honest services fraud cases decided after *McNally*—*United States v. Antico,* 275 F.3d 245 (3d Cir. 2001); *United States v. Panarella,* 277 F.3d 678 (3d Cir.2002); and *United States v. Murphy,* 323 F.3d 102 (3d Cir.2003)-the "honest services" at issue were allegedly owed not by private individuals but by either a public official or, in the case of *Murphy,* a county political party chairman alleged to have attained the status of a de facto public official by his participation in the county's political system. *See id.* at 104.

The defendant in *Antico* was an official in Philadelphia's Department of Licenses and Inspections who failed to disclose a variety of improper financial arrangements, including one in which he regularly referred individuals who were willing to pay for assistance in completing licensing and permit applications to the mother of his child as a means to avoid his obligation to make direct child support payments. 275 F.3d at 261–65. We concluded that Antico's obligation to disclose his personal interest in the official business he was handling arose by virtue of both state and local laws. *Id.* at 263-64. We further noted that "even if we were to read these [statutory] conflict of interest provisions as restrictively as Antico suggests, we find that his conduct violated the fiduciary relationship between a public servant charged with disinterested decision-making and the public he serves." *Id.* at 264. This fiduciary relationship, we explained, imposed upon the official a duty "to disclose material information affecting an official's impartial decision-making and to recuse himself . . . regardless of a state or local law." *Id.* Because Antico's intentional concealment of his conflict of interest violated both state and local law, as well as his fiduciary duty to the public, we concluded that there was sufficient evidence to uphold Antico's conviction for honest services fraud under §§ 1341, 1343, and 1346. *Id.* at 264-65.

In *Panarella,* the owner of a tax collecting business challenged the sufficiency of an information that charged him with being an accessory after the fact to a state senator's commission of honest services fraud. 277 F.3d at 679-81. Panarella did not dispute that the senator concealed a

---

**3.** Although "[s]ection 1346 was enacted without much comment and little legislative history," *Antico,* 275 F.3d at 261 n. 16, the "com-mentary and judicial reflection indicate that the statute was enacted to overturn *McNally.*" *Id.*

financial interest in Panarella's business contrary to Pennsylvania's disclosure statute, which criminalized such conduct. *Id.* at 679, 690. Instead, Panarella argued that, in the absence of an allegation that the senator misused his office for personal gain, the superseding information failed to state an offense. *Id.* at 691–92. We rejected this argument, holding instead that "where a public official takes discretionary action that the official knows will directly benefit a financial interest that the official has concealed in violation of a state criminal law, that official has deprived the public of his honest services under 18 U.S.C. § 1346." *Id.* at 691.

In rejecting Panarella's argument, we reasoned that the determination of whether a public official had misused his office for personal gain was an ambiguous standard. *Id.* at 692–93. The violation of Pennsylvania's disclosure statute served as a "better limiting principle for purposes of determining when an official's failure to disclose a conflict of interest amounts to honest services fraud." *Id.* The state statute at issue in *Panarella* provided clear notice for purposes of the rule of lenity that nondisclosure of the official's conflict of interest was criminal. *Id.* at 693. In addition, "the intrusion into state autonomy is significantly muted, since the conduct that amounts to honest services fraud is conduct that the state itself has chosen to criminalize." *Id.* at 694. Our holding, we explained, had a "sound basis in both doctrine and policy," as the official's conduct fell "squarely within the classical definition of fraud," which in its "elementary common law sense of deceit ... includes the deliberate concealment of material information in a setting of fiduciary obligation." *Id.* at 695 (internal quotation marks and citation omitted).

In contrast to the status of the actors in *Antico* and *Panarella*, the defendant in *Murphy* was neither a publicly-elected nor a publicly-employed official; rather, he served as the chairman of a county political party. 323 F.3d at 104. We reversed Murphy's conviction for honest services fraud because the Government failed to identify "any clearly established fiduciary relationship or legal duty in either federal or state law between Murphy and Passaic County or its citizens." *Id.* at 117. In reaching this conclusion, we noted that

> [in *Antico* and *Panarella*] we assumed, based on extensive pre-*McNally* case law, that public officials have a duty to provide honest services to the public. We then looked to state law to ascertain what standards of fiduciary care the public officials were required to meet in order to determine whether the officials defrauded the citizens of their right to honest services.

*Id.* at 115. In other words, collateral state laws established what type of fiduciary duty was required in those cases and limited the scope of honest services fraud. This limitation was important, we explained, because the "plain language of § 1346 provides little guidance as to the conduct it prohibits[,]" *id.* at 116, and the "[d]eprivation of honest services is perforce an imprecise standard." *Id.* (quoting *Panarella*, 277 F.3d at 698). For that reason, we "endorse[d] ... the decisions of other Courts of Appeals that have interpreted § 1346 more stringently and required a state law limiting principle for honest services fraud." *Id.* "Without the anchor of a fiduciary relationship established by state or federal law," we concluded, "it was improper for the District Court to allow the jury to create one." *Id.* at 104.

■ As this caselaw makes clear, the key quandary in honest services fraud jurisprudence is identifying the source of the "honest services" that are owed under the

**568**

statute and the precise circumstances under which criminal liability can flow from the deprivation of those services.[4] "Courts have expressed frustration at the lack of any 'simple formula specific enough to give clear cut answers to borderline problems.'" *Sorich v. United States,* — U.S. —, 129 S.Ct. 1308, 1310, 173 L.Ed.2d 645 (2009) (quoting *United States v. Urciuoli,* 513 F.3d 290, 300 (1st Cir.2008)). Our court has been no exception, as the trilogy of cases discussed above illustrates. *Antico* and *Panarella* discussed the services owed by public officials; in *Murphy,* services allegedly were owed by a political party official whom the Government sought to treat as a de facto public official. The honest services fraud theory as applied to public officials holds that a public official stands in a fiduciary relationship with the public, and can commit honest services fraud by breaching fiduciary duties in the course of that relationship, such as by theft, accepting a bribe, or

concealing a financial conflict of interest. In close cases we have not been unmindful of the potential for overreaching when prosecutors pursue this theory. Most prominently, in *Murphy* we deployed a "limiting principle" to guard against that potential in the public official context: we "endorse[d] ... the decisions of other Courts of Appeals that have interpreted § 1346 more stringently and required a state law limiting principle, 323 F.3d at 116, namely "that state law must provide the specific honest services owed by the defendant in a fiduciary relationship," *id.* at 116 n. 5 (citing *United States v. Brumley,* 116 F.3d 728, 734 (5th Cir.1997)).[5] We declined, however, to decide whether a link with statutory law is necessary in every case. *Murphy,* 323 F.3d at 117 (reserving the question whether "a violation of a [statutorily] created fiduciary duty is *required* to sustain an honest services fraud conviction"); *Panarella,* 277 F.3d at 699 n. 9 (same).[6]

**4.** "Though it consists of only 28 words, [§ 1346] has been invoked to impose criminal penalties on a staggeringly broad swath of behavior, including misconduct not only by public officials and employees but also by private employees and corporate fiduciaries." *Sorich v. United States,* — U.S. —, 129 S.Ct. 1308, 1309, 173 L.Ed.2d 645 (2009) (Scalia, J., dissenting from denial of certiorari). A broad interpretation would appear to cover, among other things, "any self-dealing by a corporate officer." *Id.*

**5.** As noted, in *Antico,* the defendant had a fiduciary duty to his employer to disclose his conflict of interest and to recuse himself, in addition to the duties imposed on him by state and local law. 275 F.3d at 264. We concluded that Antico's breach of state and local law, as well as the breach of his fiduciary duty, deprived the public of the honest performance of his services. *Id.* at 264–65. We reiterated this point in *Panarella* when we declined to decide whether a violation of state law was *"necessary* for nondisclosure of a conflict of interest to amount to honest services fraud." 277 F.3d at 699 n. 9. Again, in *Murphy,* we

pointed out that in both *Antico* and *Panarella,* the state law "clearly establishe[d] a fiduciary relationship." 323 F.3d at 117. We reversed Murphy's conviction, however, because the Government was not able to identify a preexisting fiduciary duty created by statutory or common law. *Id.*

**6.** Indeed, our post-*McNally* § 1346 precedents speak clearly only about what is sufficient to ground a charge of honest services fraud; they are more equivocal about what is necessary. For example, in both *Antico* and *Panarella* we held that the violation of state criminal statutes requiring disclosure of conflicts of interest by public officials was sufficient to show a breach of fiduciary duty within the scope of § 1346, but we also suggested in dicta that there may be an inherent "fiduciary relationship between a public servant charged with disinterested decision-making and the public he serves," and that intentional violations of fiduciary duties arising from this relationship might serve as a predicate for honest services fraud "regardless of [whether] state or federal law codif[ied] a conflict of interest." *Antico,* 275 F.3d at 264;

One purpose of the limiting principle we identified is to avoid placing federal prosecutors and courts in the role of regulating state and local politics, which might risk subverting the delicate relationship between state and federal governance. But there is another reason to require a limiting principle or principles: the exercise of interpreting a malleable term in a criminal statute which applies to a wide variety of activity may generate nebulous standards that are not discernable to people of ordinary intelligence. The latter problem is not confined to cases involving public officials. Defining the scope of the statute in its application to business relationships, like those at issue here, is also important. The federalization under the criminal law of the law of contracts and other business transactions—quintessential matters for state regulation—is a real concern. All of these considerations give pause to an expansive judicial interpretation of § 1346.

■■■ As noted, none of our prior § 1346 cases involved purely private actors. "The classic application of the intangible right to honest services doctrine has been to a corrupt public servant who has deprived the public of his honest services." *United States v. Frost*, 125 F.3d 346, 365 (6th Cir.1997). As one of our sister circuits has opined, "[t]he right of the public to the honest services of its officials derives at least in part from the concept that corruption and denigration of the common good violates 'the essence of the political contract.'" *Id.* (quoting *United States v. Jain*, 93 F.3d 436, 442 (8th Cir.1996)). Although "the literal language of § 1346 extends to private sector schemes," *Jain*, 93

F.3d at 441, "[e]nforcement of an intangible right to honest services in the private sector" arguably has a "weaker justification because relationships in the private sector generally rest upon concerns and expectations less ethereal and more economic than the abstract satisfaction of receiving 'honest services' for their own sake." *Frost*, 125 F.3d at 365.

■■■ Nonetheless, caselaw supports the conclusion that private actors can owe "honest services" under § 1346. As we have noted, because "commentary and judicial reflection indicate that [§ 1346] was enacted to overturn *McNally* and restore the evolution of mail and wire fraud to its pre-*McNally* status," *Antico*, 275 F.3d at 262, in construing § 1346 we look to "pre-*McNally* cases interpreting § 1341 and § 1343 for guidance." *Panarella*, 277 F.3d at 690; *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) ("[It is a] 'well-established' [rule of construction] that '[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" (quoting *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)) (alterations in original)); *United States v. Rybicki*, 354 F.3d 124, 142 (2d Cir.2003) (en banc) (finding "that [§ 1346's] phrase 'scheme or artifice to deprive another of the intangible right of honest services' has the meaning it had in the pre-*McNally* case law").[7] As these

---

*see also Brumley*, 116 F.3d at 734 (deciding that § 1346's "honest services" must find their source in state law but not reaching the question of whether "the breach of a duty to provide services rooted in state law [must] violate the criminal law of the state").

7. *But see Brumley*, 116 F.3d at 733 (stating that because "the doctrine of honest services was not a unified set of rules" before *McNally*, "Congress could not have intended to bless each and every pre-*McNally* lower court 'honest services' opinion"). *Brumley*'s caveat is well taken, but as explained below, we find

cases show, honest services fraud has been found to encompass "purchasing agents, brokers, union leaders, and others with clear fiduciary duties to their employers or unions [who defrauded] their employers or unions by accepting kickbacks or selling confidential information," as well as private actors who have "us[ed] the mails to defraud individuals of their rights to privacy and other nonmonetary rights." *McNally*, 483 U.S. at 354–55 & nn. 3 & 4, 107 S.Ct. 2875 (Stevens, J., dissenting) (listing cases); *see Rybicki*, 354 F.3d at 138 n. 13 (further developing Justice Stevens's catalogue of private sector honest services fraud cases). For example, in *United States v. Boffa*, 688 F.2d 919 (3d Cir.1982), we affirmed the conviction of two defendants for depriving employees of the honest services owed them by the president of their union. Under federal law, we observed, "[t]here is little doubt that union officials owe union members a fiduciary duty." *Id.* at 930. Dicta in our post-*McNally* caselaw is consistent with this conclusion. *See Antico*, 275 F.3d at 261 (observing that the "intangible rights doctrine" reaches "public *and private* fraud" (emphasis added)); *id.* at 263 (noting that the "duty to disclose a conflict of interest" can arise "in the private sector from the fiduciary relationship between an employer and an employee"); *see also infra* note 11 (citing cases from other courts of appeals).

## B.

■ In this case, counts 3, 5, 6, 7, 8, and 9 charged defendants with depriving BFTC of their honest services (the "BFTC counts"). The Superseding Indictment alleged that McGeehan "was the President and Chief Executive Officer of BFTC and was in control of its daily operations. He was answerable to BFTC's Board of Directors." As to Haluska, the Superseding Indictment averred that she "was the Vice–President and Chief Operating Officer of BFTC, and worked closely with [McGeehan] in managing its daily operations." While McGeehan and Haluska were at the helm of BFTC, the Superseding Indictment alleged that they acted in contravention of the best interests of BFTC by "abus[ing] their authority by knowingly causing BFTC to spend money in excess of amounts budgeted." As part of the scheme to defraud BFTC, the Superseding Indictment averred that McGeehan and Haluska "circumvent[ed] and prevent[ed the] operation of internal controls designed to allow oversight of management and prevent fiscal abuse." This allowed "BFTC to pay for personal expenditures for the benefit of [defendants] and other employees without proper business purposes" and to make "excessive expenditures" for lavish travel and entertainment. In addition, defendants "impair[ed] the functions of employees assigned to perform internal financial accounting that was intended to assure that BFTC remained within budget and met its obligations to the Commonwealth of Pennsylvania and the United States Navy." [8] The BFTC counts further averred that the defendants withheld information from BFTC's Board of Directors "that should have been disclosed consistent with the honest fulfillment of their employment responsibilities," thereby breaching their duty to operate BFTC in a fiscally responsible manner and

---

sufficient consensus in the caselaw as to the issues dispositive of this case.

**8.** We need not decide whether the allegations that defendants circumvented management

and accounting practices would, unaccompanied by the other elements of the scheme, suffice to charge honest services fraud.

causing the BFTC to "suffer substantial financial harm."

The above allegations are sufficient to demonstrate that defendants owed a fiduciary duty to BFTC by virtue of their status as corporate officers, and that defendants were obligated to disclose any personal interests in matters over which they had decision-making power. *See In re United Artists Theatre Co.*, 315 F.3d 217, 230 n. 14 (3d Cir.2003) (stating that "officers are fiduciaries of the corporations they serve").[9]

 On appeal, defendants concede that they owed the BFTC a fiduciary duty to disclose material information. The Su-

perseding Indictment adequately alleged facts to establish that the defendants had a fiduciary relationship with BFTC of a type recognized in our case law. We think the alleged intentional violation of such a clearly defined fiduciary duty may serve as the basis for an honest services fraud charge without offending principles of fair notice or threatening to convert mere breaches of contract into federal crimes. Accordingly, we find that counts 3, 5, 6, 7, 8, and 9 of the Superseding Indictment made out the necessary elements of honest services fraud and the District Court did not err by denying the motion to dismiss these counts.[10]

9. One of our sister circuits has concluded that "[f]ederal law governs the existence of fiduciary duty under the mail fraud statute." *Frost*, 125 F.3d at 366. We need not decide this issue here, however, because it is clear that defendants owed a fiduciary duty to BFTC under state law as well. *See* 15 Pa. Cons.Stat. Ann. § 1712; *Seaboard Industries, Inc. v. Monaco*, 442 Pa. 256, 276 A.2d 305, 309 (1971) (discussing fiduciary duty owed to a corporation by its directors and officers).

10. Noting our statement in *Antico* that "[h]onest services fraud typically occurs in two scenarios: (1) bribery, where a legislator was paid for a particular decision or action; or (2) failure to disclose a conflict of interest resulting in personal gain," 275 F.3d at 262–63, Appellants suggest that the statute covers only these two types of conduct. This argument is unavailing for several reasons. First, as the modifier "typically" implies, this categorization is not necessarily exhaustive. Second, in *Panarella*, which we decided after *Antico*, we expressly rejected the argument that honest services fraud *requires* a showing of personal gain. 277 F.3d at 692–93. Third, and perhaps most significantly, we have no trouble discerning a conflict of interest (which, for that matter, resulted in personal gain) from the facts alleged in the Superseding Indictment. Appellants are alleged, inter alia, to have misdirected corporate funds to finance personal expenditures. In diverting corporate funds to unauthorized personal purposes, Appellants, who were corporate officers, served their own interests, rather than

those of their corporation. Moreover, Appellants failed to disclose this conflict of interest.

Appellants also assert that "[n]ot every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud." McGeehan's Br. 8–9. Nothing we have said here suggests otherwise. We hold only that a collateral fiduciary duty can provide the source of the honest services owed under §§ 1341, 1343, and 1346. The breach of such a duty can therefore be the basis of a "depriv[ation] ... of the intangible right of honest services." 18 U.S.C. § 1346. In order to give rise to criminal liability, however, the deprivation of honest services must have been the result of "a scheme or artifice ... with the specific intent to defraud." *Antico*, 275 F.3d at 261 (listing the elements of mail and wire fraud).

"[T]o avoid the over-criminalization of private relationships," *Frost*, 125 F.3d at 368, some courts of appeals have added additional requirements, at least where the defendants are private actors. The Sixth Circuit, for example, insists the prosecution demonstrate that a defendant "foresaw or reasonably should have foreseen that [the entity to whom the fiduciary duty is owed] might suffer an economic harm as a result of the breach." *Id.* To satisfy this requirement, the prosecution need not show that "a defendant accused of scheming to deprive another of honest services ... intend[ed] to inflict an economic harm upon the victim. Rather, the prosecution must prove only that the defendant intended to breach his fiduciary duty, and rea-

**572**

## C.

 Defendants also challenge the sufficiency of counts 10, 11, 13, 19, 20, 21, and 22, in which the Navy was named as the victim (the "Navy counts"). These counts advance a theory of honest services fraud that is not within the core categories to which our prior cases have referred. *See Antico*, 275 F.3d at 262–63 (setting out scenarios in which honest services fraud "typically occurs"—bribery and failure to disclose conflicts of interest); *see also Rybicki*, 354 F.3d at 141–42 (holding that a "scheme or artifice to deprive another of the intangible right to honest services" in the private sector applies to "an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers)" (footnote omitted)). The Navy counts involve the conduct of private individuals who allegedly caused one business entity to breach its contractual obligations to another business entity. Unlike the BFTC counts, the Navy counts do not involve services owed pursuant to a recognized fiduciary relationship such as the officer-corporation relationship, nor has the Government contended that any other state or federal law provided for the honest services allegedly owed by BFTC to the Navy.

 We find that *Antico, Panarella,* and *Murphy*, in combination with *Boffa*, are properly read to require that the Government allege more than the breach of non-fiduciary contractual duties in order to charge a private individual with honest services fraud. We adhere to the view we espoused in *Panarella* and *Murphy* that § 1346 requires a limiting principle. *Panarella*, 277 F.3d at 693–94 (declaring that the "use of state law as a limiting principle defining the scope of honest services fraud" better addresses federalism concerns than the ambiguous standard of whether there was a misuse of office for personal gain); *Murphy*, 323 F.3d at 116–17 (noting that state law serves as an important limiting principle on the scope of § 1346 honest services fraud and avoids federalism concerns inherent in federal prosecution of state or local political officials). Without such a restraint, the reach of § 1346 is potentially limitless, threatening to transform what are essentially contract and employment disputes into federal crimes. As discussed above, this potential implicates serious federalism concerns, turning conduct that has traditionally been regulated by the states in their civil and

sonably should have foreseen that the breach would create an identifiable economic risk to the victim." *Id.* at 369.

Other courts have rejected the "reasonably foreseeable" standard in favor of a materiality one, finding that the latter "has the virtue of arising out of fundamental principles of the law of fraud: A *material* misrepresentation is an element of the crime." *Rybicki*, 354 F.3d at 146 ("The 'non-*de minimis* reasonably foreseeable harm' test, by contrast, seems to be something of an *ipse dixit* designed simply to limit the scope of section 1346."). Under this standard, "the misrepresentation or omission at issue for an 'honest services' fraud conviction must be 'material,' such that the information or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct," that is, "the victim's knowledge of the scheme would tend to cause the victim to change his or her behavior." *Id.* at 145–46.

We need not decide which of these requirements, if either, is appropriate because the conduct alleged in the Superseding Indictment clearly satisfies both standards. If the defendants intentionally and deceptively misappropriated BFTC's funding for their own personal expenditures, as the Superseding Indictment charges, it was reasonably foreseeable (if not virtually inevitable) that this breach of fiduciary duty would economically harm BFTC. This breach of fiduciary duty was also material; a reasonable corporation, alerted to the diversion of funds, would tend to alter its conduct to prevent the misuse.

criminal courts into federal crimes. *See United States v. Cochran*, 109 F.3d 660, 667 (10th Cir.1997) (noting the breadth of § 1346, which "in the context of a commercial transaction" could make "every breach of contract or every misstatement made in the course of dealing" a deprivation of honest services and a federal felony); *see* *also United States v. Sun–Diamond Growers of Cal.*, 138 F.3d 961, 973 (D.C.Cir. 1998) (acknowledging that § 1346 in the private sector context "poses special risks" as "[e]very material act of dishonesty ... [could be] converted into a federal crime by the mere use of the mails or interstate phone system").[11]

**11.** Several of our sister courts of appeals have determined that the breach of a fiduciary duty is sufficient to establish honest services fraud. *See United States v. Browne*, 505 F.3d 1229, 1265 (11th Cir.2007) (affirming a § 1346 conviction of a labor union official who owed a fiduciary duty to union members); *United States v. Williams*, 441 F.3d 716, 723–24 (9th Cir.2006) (concluding that a financial advisor and estate planner had a fiduciary duty to his client who had appointed him as his agent in a durable power of attorney and had entrusted him with large sums of money); *United States v. Vinyard*, 266 F.3d 320, 327–28 n. 5 (4th Cir.2001) (declining to decide whether a breach of a fiduciary duty was necessary for an honest services fraud conviction because the defendant had in fact aided and abetted his brother's breach of his fiduciary duty to his corporate employer); *United States v. de-Vegter*, 198 F.3d 1324, 1330–31 (11th Cir. 1999) (reversing a dismissal of the indictment as it sufficiently alleged that the defendant breached a fiduciary duty to his client, which had "relinquished de facto control of the underwriter selection decision" to the defendant); *United States v. Pennington*, 168 F.3d 1060, 1065 (8th Cir.1999) (affirming an honest services fraud conviction of a corporate officer who owed a fiduciary duty to disclose material information to his corporation); *see also Cochran*, 109 F.3d at 665 (reversing a § 1346 conviction because the Government failed to prove that the defendant had a duty to disclose).

We recognize that the Court of Appeals for the Eighth Circuit has concluded that the existence of a fiduciary relationship is not an element of honest services fraud. *See United States v. Ervasti*, 201 F.3d 1029, 1036 (8th Cir.2000). The Court of Appeals for the Second Circuit also so held in *United States v. Sancho*, 157 F.3d 918, 921 (2d Cir.1998) (per curiam); as explained *infra*, however, a subsequent en banc decision undermines that holding.

In *Sancho*, the defendant moved to dismiss the indictment on the ground that the Government could not prove that a fiduciary duty was owed. This argument was renewed in the defendant's Rule 29 motion. The Second Circuit rejected the argument, holding that § 1346 does not require the existence of a fiduciary relationship because the necessary element of § 1346 is "a *scheme* to deprive another of the right of honest services." 157 F.3d at 920. The defendant relied upon pre-*McNally* case law, which suggested that a fiduciary duty was necessary. *Id.* at 921 (citing *United States v. Alexander*, 741 F.2d 962, 964 (7th Cir.1984); *United States v. Bronston*, 658 F.2d 920, 926–27 (2d Cir.1981); and *United States v. Von Barta*, 635 F.2d 999, 1006–07 (2nd Cir.1980)). The court dismissed these cases as no longer "pertinent" to the analysis of honest services fraud after the enactment of § 1346. *Id.* Relying on §§ 1343 and 1346 only, the court reasoned that nothing in the language of these statutes required a breach of a fiduciary duty. *Id.* at 920.

In *Ervasti*, the defendant, who was convicted under §§ 1341 and 1346, argued on appeal that the district court abused its discretion by instructing the jury that it could find a fiduciary duty where none existed as a matter of law. 201 F.3d at 1036. The Eighth Circuit held that the district court did not abuse its discretion because § 1346 does not require a fiduciary duty for an honest services fraud conviction. *Id.* In so holding, the Court acknowledged a prior Eighth Circuit decision in which the defendant had breached a fiduciary duty, and the Court affirmed the honest services fraud conviction. *Id.* (citing *United States v. Pennington*, 168 F.3d 1060 (8th Cir. 1999)). Citing *Sancho*, the *Ervasti* court reasoned that there was no language in *Pennington*, § 1341, or § 1346 that imposed a fiduciary duty requirement. *Id.* Parenthetically, the Court acknowledged that the existence of a fiduciary duty "may be a powerful indication that [the defendant] also has deprived another of the right of honest services." *Id.*

■ Here, we find no allegations in the indictment suggesting the presence of legally cognizable fiduciary duties owed by BFTC to the Navy. In its brief on appeal, the Government advances no argument that the indictment supports that theory, instead relying solely on the duty of "good faith and fair dealing" inherent in the contract. The contract itself does not purport to impose any fiduciary duty on BFTC. At oral argument, the Government suggested that BFTC was the Navy's fiduciary because it acted as the Navy's agent under the contract. But the indictment did not contain any allegations suggesting that the BFTC had a relationship with the Navy of the type that is regarded by state or federal law as imposing a fiduciary duty upon the agent. Instead, the allegations of the Superseding Indictment indicate that there was a contractual relationship between the BFTC and the Navy, which obligated the BFTC to administer the NNEOMT project.[12]

The reasoning in *Sancho* and *Ervasti*—that no fiduciary duty is required because the plain language of §§ 1341, 1343, and 1346 does not impose such a requirement—is not persuasive. The imprecise language of these statutes, and their consequent expansive reach, is the very reason we have hewed to a jurisprudence of restraint in our interpretation of the honest services fraud provision. *See Panarella*, 277 F.3d at 693; *Murphy*, 323 F.3d at 115–16. Yet neither *Sancho* nor *Ervasti* addresses this concern.

Moreover, *Sancho* has been undermined by the Second Circuit's subsequent en banc decision in *Rybicki*. There, the Second Circuit explicitly rejected the *Sancho* dictum that pre-*McNally* case law was not pertinent to understanding the reach of § 1346. *Rybicki*, 354 F.3d at 144. The court in *Rybicki* explained that pre-*McNally* case law was relevant for the limited purpose of determining what Congress intended when it enacted § 1346. *Id.* at 145. Based on its analysis of case law prior to the enactment of § 1346, *Rybicki* held that a "scheme or artifice to deprive another of the intangible right to honest services" in the private sector applied to "an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers)." *Id.* at 141–42 (footnote omitted). Although the Second Circuit did not clarify whether this duty of loyalty rose to the level of a fiduciary obligation, the holding calls into question *Sancho*'s insistence that no duty was required. Indeed, the *Rybicki* court did make clear that its holding addressed the federalism and lenity concerns posed by § 1346. *Id.* at 142 ("Because we find that the phrase 'scheme or artifice to deprive another of the intangible right of honest services' has the meaning it had in the pre-*McNally* case law, we think that the potential reach of section 1346 is not 'virtually limitless.' (citation omitted)).

12. The Superseding Indictment averred that the BFTC "operat[ed] under the supervision of the Pennsylvania Department of Community and Economic Development." Its "public mission" was "to encourage and facilitate technological advances and associated economic growth" in Western Pennsylvania. To that end, BFTC "administered funds allocated by the Commonwealth of Pennsylvania for economic development grants." In 1995, BFTC began to administer funds allocated under the NNEOMT Agreement with the Navy. The Superseding Indictment alleged that the BFTC received funds from both the Commonwealth of Pennsylvania and the Navy to "fund payments owed ... to grant recipients or to research subcontractors" and "to pay for BFTC's own legitimate expenses incurred in administering" the Commonwealth grant program and the NNEOMT Agreement. The funds allocated by the Commonwealth of Pennsylvania and the Navy were to be used "solely for the administration of" the Commonwealth grant program and the NNEOMT, respectively. In contravention of the requirements imposed by the Commonwealth and the NNEOMT Agreement, defendants "caus[ed] BFTC improperly to spend excessive amounts for unallowable, unreasonable and unnecessary costs, including costs for lavish travel and entertainment, and costs otherwise without a proper business purpose." Defendants permitted the entry of these expenses on BFTC's books as though they were "ordinary general and administrative expenses, or direct expenses, that the organization was allowed to incur" under the NNEOMT Agreement. Among the unauthorized expenses was

Because the Superseding Indictment contained no facts suggesting that BFTC owed a fiduciary duty to the Navy, we conclude that the Superseding Indictment did not aver sufficient facts to allege the aiding and abetting of honest services fraud in counts 10, 11, 13, 19, 20, 21, and 22.

## IV.

For the reasons set forth, we will affirm the judgment of the District Court as to counts 3, 5, 6, 7, 8, and 9. We will vacate the judgment of the District Court on counts 10, 11, 13, 19, 20, 21, and 22. Defendants claim that their convictions on counts 23 through 29, for violating 18 U.S.C. § 1031, were tainted by the introduction of evidence related to the mail and wire fraud counts. We will remand to the District Court for determination of this issue.

a lavish event costing more than $700,000 and paid for using funds allocated under the NNEOMT contract. The unauthorized expenditures caused funding shortfalls under the NNEOMT Agreement.

These allegations clearly established that there was a contractual agreement between the BFTC and the Navy. Although the Superseding Indictment did not allege that the parties to this NNEOMT Agreement owed a duty of good faith and fair dealing to each other, the existence of the contract suggests that such a duty existed. *See* Restatement (Second) of Contracts § 205 (1981). As we explained above, however, the fact that a contract imposes a duty of good faith and fair dealing does not, without more, create a fiduciary relationship. Our scrutiny of the allegations of the Superseding Indictment reveals nothing that would have converted this NNEOMT Agreement from an arm's length transaction between sophisticated parties into a relationship imposing a fiduciary duty upon BFTC.