In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1930

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAZARO MEDINA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09-cr-00994 — **Elaine E. Bucklo**, *Judge.*

ARGUED DECEMBER 3, 2012 — DECIDED AUGUST 27, 2013

Before WOOD and HAMILTON, *Circuit Judges*, and DARROW,
*District Judge.*[*]

DARROW, *District Judge.* Lazaro Medina appeals the sentence he received after pleading guilty to conspiracy to distribute cocaine and possession of cocaine with intent to distribute. Medina challenges the district court's drug quantity

[*] Of the Central District of Illinois, sitting by designation.

calculation at sentencing, arguing that the court should have required proof of drug quantity beyond a reasonable doubt rather than by a preponderance of the evidence. Medina also maintains that, even if the preponderance-of-the-evidence standard applies, it was not met in his case because the evidence supporting the district court's drug quantity finding was unreliable. We reject both arguments and affirm Medina's sentence.

## I. Background

In 2007, law enforcement began investigating brothers Mario Melendez ("Melendez") and Abel Cadena-Melendez ("Cadena-Melendez") for their involvement in a drug trafficking organization operating out of the Little Marketa General Store in Plano, Illinois. Government agents obtained a wiretap and conducted surveillance of Melendez's store and home. The trail soon led to Lazaro Medina, who was fronting cocaine to the Melendez brothers. Telephone and physical surveillance confirmed the negotiation and subsequent delivery of one kilogram of cocaine by Medina to Melendez in August of 2008. Medina was charged by criminal complaint with conspiring to distribute cocaine on December 9, 2009, and was arrested at his home the next day. During a subsequent search of Medina's garage, agents discovered 9.5 kilograms of cocaine, packaging materials, $124,124 in cash, and $51,890 worth of jewelry.

On February 3, 2010, a grand jury returned a five-count indictment charging Medina with, among other things, conspiracy to distribute cocaine (Count One) and possession of cocaine with intent to distribute (Count Three) in violation of 21 U.S.C. § 841(a)(1) and § 846. Medina pleaded guilty to

Counts One and Three of the indictment on September 28, 2010, without a written plea agreement. At the change of plea hearing, government counsel summarized the evidence to establish a factual basis for Medina's plea. The government stated that between approximately 2001 and December 2009, Medina supplied kilogram quantities of cocaine to Melendez and Cadena-Melendez on a regular basis without receiving immediate payment. The government also detailed Medina's delivery of a kilogram of cocaine to Melendez on August 18, 2008, as well as the 9.5 kilograms of cocaine found in Medina's garage. Following the summary of the evidence, the district judge asked Medina, "Have you heard the statement of the Assistant United States Attorney?" to which Medina responded, "Yes." When asked by the court whether the government's statement was "true," Medina said, "Yes." The court then asked Medina to summarize what he did, to which Medina responded, "I had that substance to sell, yes … . That substance was cocaine." The court then accepted Medina's plea of guilty.[1] A few months later, on April 4, 2011, Medina provided a safety valve interview to the government under 18 U.S.C. § 3553(f) in an effort to obtain relief from the ten-year mandatory minimum sentence. In that interview, however, Medina claimed that he did not begin supplying Melendez

---

[1] On May 11, 2011, Medina filed a written motion to withdraw his guilty plea on the grounds that Medina's former attorney had never reviewed the consequences of a blind plea with him, and that Medina did not speak sufficient English to understand the charges to which he pleaded guilty. Following an evidentiary hearing, the district court denied the motion, finding that Medina had understood the charges against him and had voluntarily entered his guilty plea.

with cocaine until January or February of 2009, and that he never provided Melendez with kilogram quantities.

In Medina's Presentence Investigation Report ("PSR"), the probation officer determined that Medina was responsible for at least 67.5 kilograms of cocaine, a calculation supported by two post-arrest statements made by Melendez that detailed a history of prior dealing with Medina going back to 2001. Medina objected to the PSR, claiming that only the cocaine seized during the course of the investigation should be attributed to him. According to Medina, that cocaine (9.5 kilograms from his garage, two 1-ounce controlled buys, 249 grams seized from a codefendant's vehicle, and 208 grams found in the Little Marketa store) placed him in the 5–15 kilogram range.

In a supplemental sentencing memorandum, the government provided further detail regarding Melendez's statements. In Melendez's first post-arrest statement he admitted that Medina began supplying cocaine to him after they met at a party in 2001. Medina started out fronting Melendez one-quarter kilogram quantities of cocaine, but it soon picked up such that from 2001 to 2006, Medina was supplying Melendez with one kilogram every four to six weeks. Between 2006 and 2009, Melendez stated that the frequency decreased to one kilogram every six to eight weeks, and estimated that he had received ten kilos from Medina since 2006. The government therefore argued that Medina should be held responsible for 70.5 kilograms: 40 kilograms from 2001 to 2006, 21 kilograms from 2006 to 2009, and the 9.5 kilograms seized from Medina's garage.

In Melendez's second statement, given pursuant to a safety valve interview on January 24, 2011, his story changed somewhat. Melendez said that after he met Medina in 2001, Medina began fronting him one-quarter kilograms every month for six months; after six months, Melendez received one-half kilograms every month for another six months. In 2002 or 2003, Medina started fronting Melendez one kilogram of cocaine every six to eight weeks. In 2005, the frequency dropped to one kilogram every two months, and in 2007 Medina went back to fronting one-quarter kilogram quantities. Based on Melendez's second statement, the government's estimate dropped to 52.5 kilograms: 4.5 kilos in the first year of dealing, 32.5 kilos from 2002 to 2007, and the 9.5 kilograms seized. Accordingly, based on Melendez's statements and the cocaine seized from Medina, the government took the position at sentencing that Medina was accountable for more than 50 kilograms of cocaine.

At the sentencing hearing, the government affirmed that its position regarding Medina's drug quantity calculation was based mostly on Melendez's statements. Although Melendez did not testify at the hearing, the government argued that his prior statements were reliable because they were made against interest and were corroborated by evidence gathered during the course of the investigation. Medina argued that the statements were not made against interest. Further, Medina challenged the court's reliance on Melendez's statements because the court did not have the opportunity to judge his credibility firsthand. After hearing argument, the district court placed Medina in the 15–50 kilogram range, stating:

> It's going to be 15 to 50. If he's wrong because it's—the difference there admittedly on your conser-

vative estimate is two and a half kilograms, but he's found in his garage with 9.5 kilograms? People don't have 9.5 kilograms of cocaine sitting around who aren't big dealers, let alone the hundred and some thousand dollars in jewelry and whatever else there was. All right. It may be awfully conservative, but he'll get the benefit of the doubt. It's between 15 and 50 kilograms.

I do believe that Mr. Melendez's statements are so against his own interests that they can be believed in terms of general substance. What bothers me in saying it's over 52.5 is we are talking about going back a long time and remembering exactly how much it would be every month or how often. So I am more comfortable in saying that it is someplace 50 or below, but I'm sure it's well over the 15.

Based on this drug quantity finding, Medina's base offense level was 34. After including a two-level enhancement for obstruction of justice, and denying Medina credit for acceptance of responsibility under U.S.S.G. § 3E1.1, the court found that Medina had an advisory Sentencing Guidelines range of 188–235 months. Following additional argument from the parties concerning application of the Guidelines factors set out in 18 U.S.C. § 3553(a), the court imposed a sentence of 190 months imprisonment on Counts One and Three of the indictment and five years of supervised release. This appeal followed.

## II. Discussion

Medina raises two issues on appeal. He first argues that proof of drug quantity, for purposes of determining relevant conduct at sentencing, should be proved beyond a reasonable doubt instead of by a preponderance of the evidence. His second argument is that, even under the preponderance-of-the-evidence standard, the district court erred by basing its drug quantity finding on Melendez's unreliable statements. We address each argument in turn.

### A. Standard for Proving Drug Quantity at Sentencing

We can easily dispose of Medina's first argument. Medina asserts that the district court should have required that drug quantity be proved beyond a reasonable doubt for purposes of determining relevant conduct at sentencing. Anything less, Medina claims, impinges upon his due process rights by allowing the judge's findings at sentencing to disproportionately increase his sentence relative to the evidence supporting the underlying offense. We have previously disavowed this argument and do so again here, as it is well-established that a preponderance of the evidence is all that is required for a factual finding of drug quantity under the Sentencing Guidelines, due process concerns notwithstanding. *See United States v. Johnson*, 342 F.3d 731, 735 (7th Cir. 2003); *United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006). In any event, Medina raised this point to preserve it for appeal, and we will move on.

### B. The District Court's Drug Quantity Finding

Medina's second argument is that the district judge's drug quantity determination was not supported by even a prepond-

erance of the evidence. We review a district court's factual finding of drug quantity for clear error and will reverse "only if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *United States v. Hankton*, 432 F.3d 779, 789 (7th Cir. 2005) (citations and quotes omitted). To prove drug quantity by a preponderance of the evidence, the government must show that it was more likely than not that Medina possessed the 15–50 kilograms of cocaine upon which his sentence was based. *United States v. Breland*, 356 F.3d 787, 795 (7th Cir. 2004). In making its drug quantity finding, the district court is not limited to evidence admissible at trial, but it must base its sentence on information with "sufficient indicia of reliability to support its probable accuracy," *United States v. Longstreet*, 567 F.3d 911, 924 (7th Cir. 2009).

In this case, for purposes of determining Medina's offense level, the district court based its drug quantity finding on two statements made by Melendez that were contained in Medina's PSR. Before addressing whether the district court improperly relied on Melendez's statements, some context is appropriate. Even without taking into account the drugs that Melendez attributed to him, Medina was looking down the barrel of 10.5 kilograms of cocaine: 9.5 kilograms from his garage plus the 1 kilogram he admitted to in his plea agreement (not to mention the $124,124 in cash, which translates to about 5 kilograms, but the government did not make a cash-to-drugs conversion argument). The point is that getting Medina over the 15 kilogram hurdle did not require much: all the district judge needed to find was an extra 4.5 kilograms. The question is therefore whether the judge clearly erred in relying on

Melendez's testimony to increase Medina's drug quantity from 10.5 kilograms to 15.

Medina claims that the district court erred by relying on Melendez's statements because they were self-serving and therefore inherently unreliable. According to Medina, Melendez was actually getting his drugs from sources that included the Arellano-Felix cartel, and when Melendez got caught he decided to finger Medina rather than risk reprisals from the cartel. Medina claims that Melendez's statements were not against interest because they shielded him from the cartel's retribution. But Medina overstates the role of the Arellano-Felix cartel in Melendez's drug operation (the cartel's involvement was minimal) and understates the damaging nature of Melendez's admissions. The police only seized about half a kilogram from Melendez over the course of two years, yet Melendez admitted to receiving between approximately 40 and 60 kilograms of cocaine since 2001. It was certainly against Melendez's penal interest to admit to about 100 times as much cocaine as law enforcement seized from him. Accordingly, we find no error in the district court's determination that Melendez's statements were sufficiently against interest that they could be believed in terms of general substance.

Medina also claims that the district court's reliance on Melendez was in error due to the court's inability to judge Melendez's credibility firsthand. While it is true that the court and counsel lacked the opportunity to examine Melendez in person (since Melendez's statements were contained in Medina's PSR, and Melendez refused to testify), Melendez's admissions were corroborated by ample evidence that affirms their reliability. First and foremost is the 9.5 kilograms of

cocaine found in Medina's garage, which lends credence to Melendez's statements and belies Medina's contention at sentencing that he had distributed no more than about one kilogram of cocaine to Melendez through all of 2008 and 2009. On top of that was the $124,124 in cash (which equals about 5 kilograms of cocaine) and $51,890 worth of jewelry, which further corroborates Melendez's admissions as to the breadth and scope of the conspiracy. Medina essentially asks us to pretend that these drugs, money, and jewelry shed no light on whether Medina did in fact deal more than 4.5 kilograms of cocaine to Melendez. But of course they do bear on that question, and the district court appropriately considered them. As the district judge noted, small time dealers do not keep nearly ten kilograms of cocaine on hand, much less cash and jewelry worth about $175,000. District courts may reasonably estimate the quantity of drugs attributable to a defendant, *United States v. Acosta*, 534 F.3d 574, 582 (7th Cir. 2008), and given this evidence there was nothing unreasonable about the district court's cautious reliance on Melendez's testimony in order to estimate Medina's drug quantity.

For these reasons, we find no error on the part of the district judge, who adequately considered the potential pitfalls raised by relying on Melendez's testimony and adopted a conservative estimate of drug quantity that was supported by the evidence. There was no improper speculation or "nebulous eyeballing" going on here, see *United States v. Jarrett*, 133 F.3d 519, 530 (7th Cir. 1998), only reasonable estimations and inferences. Because the district court's drug quantity calculation was supported by a preponderance of the evidence, we affirm.

### III. Conclusion

The judgment of the district court is AFFIRMED.